UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

MARCUS GREEN,

                              Petitioner,

    v.                                                    9:17-CV-0392
                                                              (BKS)
M. CAPRI,

                              Respondent.
_____

APPEARANCES:                                          OF COUNSEL:

MARCUS GREEN
08-A-3378
Petitioner, pro se
Sing Sing Correctional Facility
354 Hunter Street
Ossining, NY 10562

HON. ERIC T. SCHNEIDERMAN                              PAUL B. LYONS, ESQ.
Counsel for Respondent                                 PRISCILLA I. STEWARD, ESQ.
Office of the Attorney General                         Assistant Attorneys General
120 Broadway
New York, New York 10271

BRENDA K. SANNES
United States District Judge

## DECISION and ORDER

### I.      INTRODUCTION

      Petitioner Marcus Green, proceeding pro se, seeks a writ of habeas corpus pursuant

to 28 U.S.C. § 2254.  Dkt. No. 1, Petition ("Pet.").  Respondent filed a response in opposition

to the petition and pertinent records from the state court proceedings.  Dkt. No. 17, Answer;

Dkt. No. 17-1, Respondent's Memorandum of Law in Opposition to the Petition for a Writ of

Habeas Corpus ("R. Mem."); Dkt. Nos. 17-2, 18, 18-1, 18-2, 18-3, 18-4, State Court Records.

Liberally construed, the petition contends that petitioner is entitled to habeas relief on the following grounds: defense counsel rendered ineffective assistance (Ground One, Ground Four); his conviction must be vacated based upon newly discovered evidence (Ground Two); and the prosecution failed to disclose material in violation of *Brady v. Maryland*, 373 U.S. 83 (1963) (Ground Three).  Pet. at 5-10.

For the reasons that follow, the petition is dismissed.

## II.    RELEVANT BACKGROUND

The New York State Supreme Court, Appellate Division, Third Department, summarized the pertinent facts as follows:

> In October 2003, the three child victims moved into a house in the City of Albany shared by defendant, his girlfriend (who had become custodian of the victims after their mother's death) and the couple's four children.  Defendant moved out of the home in January 2005, the day after victim C disclosed to the girlfriend that defendant had acted inappropriately towards her; almost two years later, victim A disclosed that defendant had subjected him to oral and anal sexual contact between 2003 and 2005.  Victim B then disclosed that defendant had subjected him to sexual contact as well.  As a result, defendant was arrested and charged by indictment with the crimes of course of sexual conduct against a child in the first degree related to victim A and three counts of endangering the welfare of a child.
>
> All three victims testified at the 2008 jury trial, at which time victim A was 12 years old, victim B was 13 years old and victim C was 11 years old.  Defendant was convicted of the crimes of course of sexual conduct against a child in the first degree and three counts of endangering the welfare of a child, one count with respect to each victim.  Defendant was sentenced to an aggregate prison term of 25 years and five years of postrelease supervision[.]

*People v. Green*, 108 A.D.3d 782, 783 (3d Dep't 2013).  On September 20, 2013, the New York Court of Appeals denied leave to appeal.  *People v. Green*, 21 N.Y.3d 1074 (2013).

Following his direct appeal, petitioner filed a counseled motion, dated November 14, 2014, to vacate the judgment of conviction pursuant to New York Criminal Procedure Law ("CPL") § 440.10. Dkt. No. 18-3 at SR 180-238.[1] One of the bases for petitioner's motion was his actual innocence based upon purported newly discovered evidence, including an affidavit from one of the victims, recanting her trial testimony. *Id.* at SR 184, 192, 200-201. On August 6 and August 12, 2015, the Albany County Court held a hearing on petitioner's motion. In a written decision dated December 11, 2015, the court denied the motion. Dkt. No. 18-3 at SR 269-272. Petitioner sought leave to appeal, and, on February 3, 2016, the Third Department denied that application. Pet. at 2; Dkt. No. 17-2 at USR 8.[2]

The specific facts are known to the parties and will be enumerated only to the extent necessary to address the issues raised by the petition.

## III.    DISCUSSION

### A.    Timeliness

Upon initial review of the petition, the Court directed petitioner to file a written affirmation explaining why the statute of limitations should not bar his petition. Dkt. No. 6 at 4-5, Decision and Order, filed May 19, 2017. On June 15, 2017, petitioner filed the required affirmation. Dkt. No. 7. In his affirmation, petitioner asserted that his petition should be deemed timely for the following reasons: (1) the prison at which he was confined had been locked down in the months of March 2017 and April 2017; (2) there were "various

---

[1] Page citations preceded by "SR" refer to the pages of the state court record, appearing at Dkt. No. 18-3. In his petition, petitioner asserts that his CPL § 440.10 motion was filed on November 5, 2014. Pet. at 3.

[2] Page citations preceded by "USR" refer to the unsealed state court decisions, filed separately by respondent at Dkt. No. 17-2.

administrative lockdowns" of the building where the law library was located; (3) "call outs" to access the law library "take[] a week," and, in "all the months" of 2015 and 2016, his call outs were often terminated due to lockdowns or power outrages; and (4) "[o]ver the years," there have been "various circumstances beyond [his] control" that prevented him from meeting the timeliness requirement. *Id.* at ¶¶ 3-5.

Respondent argues that petitioner's petition is untimely because (1) it was filed after the one-year limitations period expired, (2) statutory tolling is insufficient to render it timely, (3) petitioner is not entitled to equitable tolling, and (4) petitioner has not demonstrated any basis for concluding that he is actually innocent. R. Mem. at 11-15.

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") established a one-year statute of limitations for prisoners to seek federal review of their state court criminal convictions. 28 U.S.C. § 2244(d)(1). The one-year period generally begins to run from the latest of several events: the date on which the state criminal conviction became final by the conclusion of direct review or by the expiration of the time to seek direct review; the date on which an unconstitutional, state-created impediment to filing a habeas petition is removed; the date on which the Supreme Court initially recognized the constitutional right on which the petitioner bases his habeas application if that right was newly recognized and made retroactively applicable; or the date on which the petitioner could have discovered the factual predicate for the claim or claims presented through the exercise of due diligence (newly discovered evidence). 28 U.S.C. § 2244(d)(1)(A)-(D); *Gonzalez v. Thaler*, 565 U.S. 134, 148-49 (2012).

The AEDPA limitations period generally begins to run when the conviction being challenged becomes final, and petitioner does not argue to the contrary in this case. For

4

purposes of section 2244(d)(1)(A), a state conviction becomes "final" when the United States

Supreme Court denies an application for a writ of certiorari or when the time to seek certiorari

has expired, which is ninety days after the date on which the highest court in the state has

completed direct review of the case. *Thaler*, 565 U.S. at 149; *Saunders v. Senkowski*, 587

F.3d 543, 548-49 (2d Cir. 2009).

In this case, the New York Court of Appeals denied leave to appeal on September 20,

2013. *Green*, 21 N.Y.3d at 1074. Petitioner did not seek certiorari, and his conviction thus

became final for purposes of the AEDPA ninety days later, on December 19, 2013. *Thaler*,

565 U.S. at 149. Petitioner had one year from that date, or until December 19, 2014, to file a

timely federal habeas petition. *See Saunders v. Senkowski*, 587 F.3d 543, 548-49 (2d Cir.

2009). Petitioner placed his petition in the prison mailing system on April 6, 2017.[3] *See* Pet.

at 5.

### 1.    Statutory Tolling

The one-year limitation period under the AEDPA is tolled while "a properly filed

application for State post-conviction or other collateral review with respect to the pertinent

judgment or claim is pending[.]" 28 U.S.C. § 2244(d)(2); *Saunders*, 587 F.3d at 548. The

tolling provision "excludes time during which properly filed state relief applications are

pending but does not reset the date from which the one-year statute of limitations begins to

run." *Smith v. McGinnis*, 208 F.3d 13, 17 (2d Cir. 2000) (per curiam). The tolling provision

excludes from the limitations period only the time that the state relief application remained

undecided, including the time during which an appeal from the denial of the application was

---

[3] Under the "mailbox rule," a petitioner's application is deemed filed on the date he delivers it to the prison authorities for mailing. *Houston v. Lack*, 487 U.S. 266, 270 (1988); *Noble v. Kelly*, 246 F.3d 93, 97-98 (2d Cir. 2001).

taken.  *Saunders*, 587 F.3d at 548; *accord, Smith*, 208 F.2d at 16.

Here, petitioner filed a CPL § 440.10 motion on November 14, 2014, at which point 329 days had elapsed on the limitations period.  Dkt. No. 18-3 at SR 180-238.  His motion remained pending until February 3, 2016, when the Third Department denied leave to appeal from the county court's denial of his motion.  Pet. at 2.  The AEDPA limitations period was tolled while his motion was pending and expired 36 days later, on March 10, 2016.  Thus, measuring the limitations period from the date on which petitioner's conviction became final, his petition was filed over a year late.[4]

As respondent notes, petitioner's claims for relief are premised, at least in part, on his purported innocence, and in his CPL § 440.10 motion, petitioner argued that newly discovered evidence required vacatur of his conviction.  *See, e.g.,* Dkt. No. 18-3 at SR 180, 184, 189-192.  The "newly discovered evidence" included an affidavit from one of the victims, D.B., recanting her prior statements and trial testimony.  *Id.* at SR 184, 192; *accord, id.* at SR 200-201.  Pursuant to 28 U.S.C. § 2244(d)(1)(D), the one-year AEDPA limitations period may begin to run from "the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence."

Even if D.B.'s initial affidavit could be said to constitute the "factual predicate for" petitioner's claim(s), petitioner was aware of this factual predicate by, at the latest, October 14, 2014, the date on which D.B. executed the affidavit and the notary–petitioner's counsel–notarized it.  Dkt. No. 18-3 at SR 201.  The limitations period would have began on

---

[4]  Petitioner's contention that his CPL § 440.10 motion was filed on November 5, 2014, Pet. at 3, is contradicted by the date appearing on his counseled motion papers.  However, even if his assertion were correct, then 321 days of the limitations period would have elapsed before he filed his motion.  In that case, the limitations period would have expired on March 18, 2016, and his petition still would have been over a year late.

6

that date and run until it was tolled by the filing of petitioner's CPL § 440.10 motion 31 days later, on November 14, 2014.  *See* 28 U.S.C. § 2244(d)(1)(D).  That proceeding was pending until February 3, 2016, and, from that date, petitioner had 334 days–until January 2, 2017–to file a timely habeas petition.  By that measurement, the petition, filed on April 6, 2017, was 94 days late.[5]

### 2.    Equitable Tolling

The AEDPA's one-year statute of limitations period "is subject to equitable tolling in appropriate cases."  *Holland v. Florida*, 560 U.S. 631, 645 (2010).  To warrant equitable tolling, a petitioner must show "'(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way' and prevented timely filing."  *Holland*, 560 U.S. at 649 (quoting *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005)); *accord, Diaz v. Kelly*, 515 F.3d 149, 153 (2d Cir. 2008).  The standard for evaluating a claim of extraordinary circumstances is one that focuses not on "the uniqueness of a party's circumstances," but instead on "the severity of the obstacle impeding compliance with a limitations period."  *Harper v. Ercole*, 648 F.3d 132, 137 (2d Cir. 2011); *see also Rivas v. Fischer*, 687 F.3d 514, 538 (2d Cir. 2012) (explaining that whether a circumstance is extraordinary depends on "how severe an obstacle it is for the petitioner endeavoring to comply with the AEDPA's limitations period") (quoting *Diaz*, 515 F.3d at 154).

A petitioner must show not only that extraordinary circumstances existed, but that those circumstances "caused him to miss the . . . filing deadline."  *Harper*, 648 F.3d at 137.

---

[5] Again, even crediting petitioner's contention that his counseled CPL § 440.10 motion was actually filed on November 5, 2014 (Pet. at 3), the limitations period would have been tolled for only nine more days, and his petition would still have been untimely by over 80 days.

Claims of extraordinary circumstances must be supported with evidence and not merely with conclusory allegations. *Reid v. Atty Gen., State of New York*, No. 9:04-CV-0178 (TJM/RFT), 2008 WL 3049870, at *6 (N.D.N.Y. Aug. 1, 2008). Additionally, a petitioner must have acted with "reasonable diligence throughout the period he seeks to toll[.]" *Harper*, 648 F.3d at 138 (quoting *Belot v. Burge*, 490 F.3d 201, 205 (2d Cir. 2007)). If a petitioner did not exercise reasonable diligence after the extraordinary circumstance began, "the link of causation between the extraordinary circumstances and the failure to file is broken, and the extraordinary circumstances therefore did not prevent timely filing." *Baldayaque v. United States*, 338 F.3d 145, 150 (2d Cir. 2003) (quoting *Hizbullahankhamon v. Walker*, 255 F.3d 65, 75 (2d Cir. 2001)); *Mason v. Pool*, 554 F. Supp. 2d 391, 397-98 (W.D.N.Y. 2008).

In this case, the Court concludes that petitioner has not established entitlement to equitable tolling of the limitations period. First, to the extent that he argues that the facility of his confinement was locked down throughout both March and April 2017, the limitations period, whether measured under either 28 U.S.C. § 2244(d)(1)(A) or (d)(1)(D), had already expired by that time. As a result, it cannot be said that this lockdown caused him to miss the filing deadline. *Harper*, 648 F.3d at 137.

Petitioner's remaining arguments that "various administrative lockdowns" and "power outages" interfered with his ability to access the law library also do not warrant equitable tolling. Dkt. No. 7 at ¶¶ 4-5. "In general, the difficulties attendant on prison life, such as transfers between facilities, solitary confinement, lockdowns, restricted access to the law library, and an inability to secure court documents, do not by themselves qualify as extraordinary or rare circumstances." *Smith v. Annucci*, No. 9:13-CV-0454 (JKS), 2014 WL

2215765, at *3 (N.D.N.Y. May 29, 2014) (quoting *Corrigan v. Barbery*, 371 F. Supp. 2d 325, 330 (W.D.N.Y. 2005)); *accord, Floyd v. Kirkpatrick*, No. 16-CV-1034, 2017 WL 372054, at *4 (E.D.N.Y. Jan. 26, 2017) ("[T]he circumstances [petitioner] has identified as causing his delay–limited access to the law library and facility transfers–do not qualify as 'extraordinary.'"); *Warren v. Artus*, No. 9:05-CV-1032 (LEK/DEP), 2007 WL 1017112, at *10 (N.D.N.Y. Mar. 30, 2007) (concluding that petitioner's alleged "lack of access to sufficient books and legal assistance" were "insufficiently unusual or compelling to warrant . . . equitable tolling"); *Jones v. West*, 421 F. Supp. 2d 615, 618-19 (W.D.N.Y. 2006) (concluding that petitioner's claims that "his access to the prison law library was 'hindered' and that he is unversed in the law" were not "the type of 'extraordinary circumstances' that the equitable tolling doctrine contemplates").

Petitioner's generalized complaints about obstacles to his regular access to the law library, including lockdowns and power outrages on unspecified dates, are precisely the type of difficulties common to prison life that courts have found do not constitute extraordinary circumstances.  However, even if petitioner's assertions constituted extraordinary circumstances, equitable tolling is nonetheless unwarranted because petitioner has not established that he diligently pursued his rights during the period preceding the expiration of the AEDPA limitations period.  *See Harper*, 648 F.3d at 138.  While petitioner asserts conclusorily that he "pursu[ed] his rights diligently," it is unclear what efforts he made to timely file his petition despite the general obstacles he faced in accessing the law library. Dkt. No. 7 at ¶ 3.

Based upon the foregoing, the Court concludes that petitioner has failed to establish his entitlement to equitable tolling of the limitations period.

9

### 3.   Equitable Exception

The Supreme Court has held that "actual innocence, if proved, serves as a gateway through which a petitioner may pass" to avoid the "expiration of the statute of limitations." *McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013).   "'Actual innocence' means factual innocence, not mere legal insufficiency."   *Dunham v. Travis*, 313 F.3d 724, 730 (2d Cir. 2002) (quoting *Bousley v. United States*, 523 U.S. 614, 623 (1998)); *see also, e.g., Chettana v. Racette*, No. 9:15-CV-0028 (MAD), 2016 WL 447716, at *10-11 (N.D.N.Y. Feb. 4, 2016). The Supreme Court has cautioned, however, that "tenable actual-innocence gateway pleas are rare," and that a "petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt."   *McQuiggin*, 569 U.S. at 386 (quoting *Schlup v. Delo*, 513 U.S. 298, 329 (1995) and citing *House v. Bell,* 547 U.S. 518, 538 (2006) (emphasizing that the *Schlup* standard is "demanding" and seldom met)).

"To satisfy the *Schlup* standard, a claim of actual innocence must be both 'credible' and 'compelling.'"   *Rivas*, 687 F.3d at 541 (quoting *House*, 547 U.S. at 521, 538).   "For the claim to be 'credible,' it must be supported by 'new reliable evidence–whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence–that was not presented at trial.'"   *Rivas*, 687 F.3d at 541 (quoting *Schlup*, 513 U.S. at 324).   "For the claim to be 'compelling,' the petitioner must demonstrate that 'more likely than not, in light of the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt–or to remove the double negative, that more likely than not any reasonable

10

juror would have reasonable doubt.'" *Id.* (quoting *House*, 547 U.S. at 538). "Evidence that courts have considered to be 'new and reliable' includes[, *inter alia,*] written recantation of the prosecution's only witness[.]" *Barrientos v. Lee*, No. 1:14-CV-3207, 2015 WL 3767238, at *12 (S.D.N.Y. June 17, 2015) (citing *Lopez v. Miller*, 915 F. Supp. 2d 373, 405-09 (E.D.N.Y. 2013)); *see also Dizak v. McAuliffe*, No. 1:16-CV-0314, 2017 WL 1953136, at *3 (W.D.N.Y. May 10, 2017*); Rhodes v. Sheahan*, No. 9:13-CV-0057 (FJS/TWD), 2016 WL 890081, at *9 (N.D.N.Y. Jan. 12, 2016), *adopted*, 2016 WL 894095 (N.D.N.Y. Mar. 8, 2016); *Diaz v. Bellnier*, 974 F. Supp. 2d 136, 144 (E.D.N.Y. 2013).

As a corollary principle, "a state court's 'determination of a factual issue' is 'presumed to be correct,' and that presumption may be rebutted only 'by clear and convincing evidence.'" *Watson v. Artuz*, 283 F. Supp. 3d 217, 234 (S.D.N.Y. 2018) (quoting 28 U.S.C. § 2254(e)(1) and citing *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005)). "While neither the Supreme Court nor the Second Circuit have held that [28 U.S.C. § 2254(e)(1)] applies to gateway actual innocence claims, several other circuits have concluded that it does." *Jimenez v. Lilley*, No. 1:16-CV-8545, 2017 WL 4535946, at *8 (S.D.N.Y. Oct. 10, 2017) (collecting cases); *accord, Bryant v. Thomas*, 274 F. Supp. 3d 166, 184 (S.D.N.Y. 2017) (concluding that state court's determinations that petitioner "voluntarily agreed to accompany the police to the police station and that [his] confession was not the product of coercion" constituted "findings of fact entitled to deference under Section 2254(e)(1)" in the context of petitioner's gateway actual innocence claim).[6]

---

[6]  *See also, e.g., Teleguz v. Pearson*, 689 F.3d 322, 331 (4th Cir. 2012) ("[W]hen a state court has made a factual determination bearing on the resolution of a *Schlup* issue, the petitioner bears the burden of rebutting this presumption by clear and convincing evidence.") (internal quotation marks omitted); *Carr v. Warden*, 401 F. App'x 34, 38-39 (6th Cir. 2010) (summary order); *Storey v. Roper*, 603 F.3d 507, 524 (8th Cir. 2010) ("[E]ven assuming

Petitioner does not expressly argue that his actual innocence serves as a gateway to considering the merits of his habeas petition. *See* Dkt. No. 7. Even if his petition and affirmation are construed to contend that the actual innocence claim raised by him in his CPL § 440.10 motion serves as a basis for overcoming the time-bar to his habeas petition, the Court concludes that petitioner has failed to establish that the equitable exception applies.

In his CPL § 440.10 motion, petitioner asserted that newly discovered evidence required vacatur of his conviction. Dkt. No. 18-3 at SR 189. That newly discovered evidence consisted of, "first and foremost, the recent recantation of one of the complainants," affidavits from petitioner's family members, and a 2009 letter from defense counsel addressed to petitioner. *Id.*

With respect to recantations, the Second Circuit has held that, "[w]hile a recantation must be 'looked upon with the utmost suspicion,' its lack of veracity cannot, in and of itself, establish whether testimony given at trial was in fact truthful." *Ortega v. Duncan*, 333 F.3d 102, 107 (2d Cir. 2003) (citation omitted) (quoting *Sanders v. Sullivan*, 863 F.2d 218, 225 (2d Cir. 1988)). A court evaluating the credibility of a recantation "must weigh all the evidence of perjury before it, including but not limited to the recantation, before reaching this conclusion." *Ortega*, 333 F.3d at 107. Moreover, the Second Circuit has noted, in the context of a motion for post-trial relief, that "a district court should give little evidentiary weight to a recantation affidavit that has since been repudiated." *United States v. Lespier*, 266 F. App'x 5, 7 (2d Cir. 2008) (summary order) (citing *United States v. Gallego*, 191 F.3d 156, 166 (2d Cir. 1999)

---

that the evidence [identified by petitioner] was newly discovered, he is not entitled to relief. The state post-conviction court's finding that the evidence lacked credibility and conflicted with Storey's testimony is a factual finding which we presume to be correct.") (citing 28 U.S.C. § 2254(e)); *Love v. Roberts*, 259 F. App'x 58, 63 (10th Cir. 2007) ("The trial court found petitioner's newly discovered evidence to be cumulative and suffering from credibility issues. This court presumes the factual determinations of the trial court to be correct.")

(noting that a "recanted recantation . . . can only be reviewed with extreme skepticism"), *abrogated on other grounds by Crawford v. Washington*, 541 U.S. 36 (2004)); *see also, e.g., Archer v. Fischer*, No. 1:05-CV-4990, 2009 WL 1011591, at *10-11 (E.D.N.Y. Apr. 13, 2009) (concluding, based upon an "analy[sis of] the entire state court record to ensure that there is no other evidence that . . . [a witness's] trial testimony was perjured," that a repudiated recantation was not credible).

At trial, D.B., then eleven years old, testified that, during the relevant time period, she lived with her aunt, petitioner, and certain minor cousins and siblings.  Dkt. No. 18-2 at Trial Tr. ("TT") 602, 604.  D.B. recalled that, on the day before petitioner moved out of the house, she was doing laundry when petitioner approached her in the laundry room and touched her thigh.  *Id.* at TT 606-07.  Petitioner "told her" to perform oral sex on him, and she refused, went into her aunt's bedroom, and locked the door until her aunt returned home.  *Id.* at 608-09.

In support of his CPL § 440.10 motion, petitioner argued (among other things) that newly discovered evidence established that he was actually innocent of the crimes of conviction (i.e., course of sexual conduct against a child and endangering the welfare of a child).  The "newly discovered evidence" proffered by petitioner was, "first and foremost," an affidavit from D.B., sworn to on October 14, 2014, recanting her prior statements and trial testimony.  Dkt. No. 18-3 at SR 184, 192, 200-201.  In her affidavit, D.B., who was then 17 years old, averred that her aunt "told [her] and [her] brothers that [they] had to tell people that [petitioner] hurt [them.]"  *Id.* at SR 200 ¶ 2.  D.B. asserted that petitioner "was a like a second father to" the children, never touched D.B. "improperly," and "never tried to get [her] to have

13

oral sex" with him. *Id.* at ¶¶ 2-3. According to D.B.'s affidavit, her aunt "made [D.B.] say that [petitioner] did" those things and "would use belts and hangars and other things to hit [her] and [her] brothers." *Id.* at ¶¶ 3, 6. D.B. also asserted that her brother (and one of the other victims), X.B., confided in her that petitioner "never had oral or anal sex with him, but that he was . . . afraid of" her aunt. *Id.* at ¶ 7. Petitioner did not file an affidavit from X.B. in support of his motion.

In opposition to petitioner's CPL § 440.10 motion, the prosecution asserted that it had "re-interviewed" D.B. and, based on that interview, argued that the affidavit submitted in support of petitioner's motion was itself false. *Id.* at SR 242-43 ¶¶ 19-21. The prosecution submitted an affidavit from D.B., sworn to on February 11, 2015. *Id.* at SR 251-52. In her second affidavit, D.B. repudiated her earlier recantation affidavit, asserting that "the contents of [her earlier] affidavit" were untrue and that "everything [D.B.] said at [petitioner's] trial was the truth." *Id.* at SR 252 ¶¶ 12-13. She further averred that, in October 2014, Gloria Green, petitioner's mother, gave her fifty dollars and asked her to "go speak to a lawyer about [petitioner's] situation." *Id.* at SR 251 ¶¶ 7-8.[7] D.B. spoke with "the lawyer," who asked her "some questions" and directed her "to sign a paper for her." *Id.* at ¶ 9. D.B. did not read the affidavit she signed until January 28, 2015, and she became "mad" when she learned that "the contents of that affidavit were not the truth." *Id.* at SR 252 ¶¶ 10-12. Finally, D.B. averred that no one had "threatened [her] or pressured" her to sign this second affidavit, that she was doing so "freely and willingly," and that she "read it and was given the opportunity to

---

[7] D.B. also asserted that, at unspecified times, she "ha[d] been receiving messages on Facebook," as well as phone calls, from Debra Grayson, petitioner's fiancé, in which Grayson asserted that petitioner was incarcerated "for something he did not do," and that D.B. "need[ed] to tell the truth about what happened." *Id.* at SR 251 ¶¶ 5-6.

change anything contained in it" before signing it.  *Id.* at ¶¶ 15-16.

The prosecution also filed an affidavit sworn to by X.B., then nineteen years old, who averred that his trial testimony about the "sexual abuse" to which petitioner subjected him "was the truth about what happened" and that no one threatened or pressured him to provide the affidavit.  *Id.* at SR 253 ¶¶ 3-5.

In support of his reply, petitioner filed, *inter alia*, (1) an affidavit from Grayson, who asserted that she did not harass D.B. or pressure her to recant her allegations, and (2) an affidavit from Gloria Green, who denied giving D.B. any money.  Dkt. No. 18-3 at SR 261, 267.  Additionally, defense counsel averred that she prepared D.B.'s first affidavit "based on her responses to" questions that counsel asked her.  *Id.* at SR 258 ¶ 8.  Counsel had D.B. read the affidavit and asked her if there was anything she wanted to change, and D.B. signed the affidavit without making any changes.  *Id.*

In August 2015, the county court held a hearing on petitioner's CPL § 440.10 motion, at which petitioner did not call D.B. to testify.  Tonia Green, petitioner's sister, testified that, during the course of petitioner's trial, she advised petitioner's counsel that she wanted to testify on his behalf.  Dkt. No. 18 at Hearing Tr. ("HT") at 8.  Green would have testified that D.B.'s aunt (the guardian of the victims) worked as a police informant, "set . . . up" petitioner, and that, at some point in 2004, stated to Green that, "if [petitioner] isn't going to be with [the aunt], then nobody else was going to have him."  *Id.* at HT 8-9.  As far as Green knew, trial counsel did not follow up on the information she provided to him.  *Id.* at HT 9.

Green also testified that, on an unspecified night in October 2014, D.B. stayed the night at Green's house, during which time she referred to Tonia Green as "mom" and Gloria

Green as "grandma." *Id.* at HT 22.  During the visit, D.B. told Grayson, petitioner's fiancé that petitioner "didn't touch her," and Grayson prepared a "statement" by writing what D.B. was saying.  *Id.* at HT 22-23.  Tonia Green intended to "take [D.B.] to CPS in Family Court," where D.B. could provide a statement in support of a complaint accusing her aunt of child abuse.  *Id.* at HT 25-26.  Green opined that the children falsely accused petitioner of sexual abuse at the behest of D.B.'s aunt, who, according to Green, "beat them and forced them to lie." *Id.* at HT 39.  D.B. asked Green for some money, and Green told her to return to her house the next Tuesday, after Green got paid.  *Id.* at 26-27.

Nashek McFarland, Tonia Green's son, testified that he was present when D.B. told petitioner's counsel that petitioner had not abused her, and that he observed D.B. read and sign the recanting affidavit prepared by counsel.  *Id.* at HT 41.

Petitioner testified that he lived with D.B.'s aunt for fifteen years and that he never abused any of the children.  *Id.* at 48-50.  On or around January 26, 2005, he moved out of the residence where the aunt and the children lived because the aunt was "demanding and jealous." *Id.* at HT 50.  Petitioner advised trial counsel that the aunt was "jealous" and had been a police informant, and, as far as he knew, counsel did not investigate either of those issues.  *Id.* at HT 53.

Petitioner acknowledged that has been arrested several times in the past based upon allegations made by the aunt, including that petitioner assaulted her, broke into her home, and punched the aunt's daughter.  Dkt. No. 18-1 at HT 61-62.  Additionally, he testified that, to his knowledge, no complaint had ever been lodged with Child Protective Services that D.B.'s aunt abused the children in her care, and, as he asserted at trial, she was caring and

affectionate.  *Id.* at HT 76-77.

Finally, the parties stipulated to the admission of a recording of a phone conversation from October 6, 2014, between petitioner, members of his family, and D.B., during which petitioner and his family members complained that D.B.'s aunt pressured the children to fabricate the allegations. *Id.* at HT 94.[8]

In a written decision dated December 11, 2015, the Albany County Court denied petitioner's CPL § 440.10 motion.  The court noted that neither of petitioner's witnesses "had personal knowledge of the underlying facts."  Dkt. No. 18-3 at SR 270.  The court found that (1) petitioner's testimony was "unpersuasive[] and clearly self-serving," (2) D.B.'s trial testimony was credible, in light of her February 11, 2015 affidavit repudiating her recantation, (3) it was "equally clear that [petitioner], and his witnesses, are the ones who are improperly trying to get [D.B.] to change her testimony," and (4) it was "equally clear that [petitioner] acted inappropriately when he spoke to the victim on the phone and it was apparent that the victim was giving lip service to [petitioner] due to his family's pressure on her."  *Id.* at SR 271.

After carefully considering the documents submitted in support of petitioner's actual innocence claim on his CPL § 440.10 motion, as well as the content of the trial testimony, the Court concludes that D.B.'s first affidavit does not constitute "new reliable evidence" sufficient to establish that "no juror, acting reasonably, would have voted to find [petitioner] guilty beyond a reasonable doubt."  *Schlup*, 513 U.S. at 329; *accord*, *House*, 547 U.S. at 538; *Rivas*, 687 F.3d at 541.  The only evidence that D.B. did not testify truthfully about

---

[8]  Respondent filed a copy of the audio recording with the Court.  The relevant portion of the conversation consists mainly of petitioner and members of his family making statements about D.B.'s aunt's poor treatment of D.B. and coercion of the child victims, and D.B. providing single-word affirmative interjections.

petitioner's abuse at trial was her own recantation. *Cf. Ortega*, 333 F.3d at 107-08 (explaining that there were "several factors . . . provid[ing] significant evidence that" a recanting witness was "making it up" when testifying at trial, including the testimony of other witnesses rendering his trial testimony suspect and the fact that the recanting witness had admittedly lied in other trials); *see also Lespier*, 266 F. App'x at 8 (noting that, "unlike the defendant in *Ortega*, Lespier presented no evidence other than this [recanting] affidavit to prove [the witness's] alleged perjury a trial"). The Court views that recantation with "extreme skepticism" in light of D.B.'s subsequent repudiation, in which she asserted that she met with petitioner's attorney at the request of petitioner's mother, who gave her money, and that she did not read the content of the recantation affidavit at the time she signed it.[9] *Gallego*, 191 F.3d at 166; *see also Lespier*, 266 F. App'x at 8 ("[U]nlike the witness in *Ortega*, Adorno repudiated his recantation, thus presenting the District Court with a recanting affidavit of different evidentiary weight."); Dkt. No. 18-3 at SR 251.

Given the lack of any other evidence establishing that D.B.'s trial testimony was false, the Court cannot conclude that D.B.'s later-repudiated recanting affidavit constitutes the sort of new, reliable evidence necessary to render an actual innocence claim credible and compelling. *See Rivas*, 687 F.3d at 541. As a result, petitioner has not established that he is entitled to the equitable exception to the limitations period. *McQuiggin*, 569 U.S. at 386; *Schlup*, 513 U.S. at 329; *House,* 547 U.S. at 538; *see generally Doe v. Menefee*, 391 F.3d 147, 173 (2d Cir. 2004) ("While a recanting victim presents a sympathetic scenario for a

---

[9] Although D.B. stated in her recanting affidavit that her aunt was physically abusive toward her and coerced her to accuse petitioner of sexual abuse (Dkt. No. 18-3 at SR 200), those allegations were not supported by any evidence at trial, at which D.B. and the aunt testified and were subject to cross examination. Petitioner testified at trial that the aunt was caring and affectionate, and that the children were fond of her. Dkt. No. 18-2 at TT 741.

claim of actual innocence, we must not flinch from our duty to scrutinize *all* the evidence to assure ourselves of that recantation's reliability.  Here, the evidence proffered by Doe fails the strict requirements of *Schlup*.").[10]

In support of his motion to vacate, petitioner also filed affidavits from his brother (Cuyler Green), mother (Gloria Green), and sister (Tonia Green), as well as a letter from trial counsel, dated April 27, 2009, in which counsel directed petitioner to complete paperwork in support of his appeal and stated in closing, "I have proof that the kids were told to lie by their mother."  Dkt. No. 18-3 at SR 202-07, 238.  Petitioner's brother averred that, in 1991, he learned that D.B.'s aunt was working as a police informant for the Albany Police Department, and that he advised petitioner of this fact in the same year.  *Id.* at SR 202-03.[11]  He also asserted that, about six months before petitioner's arrest, the aunt stated to him that petitioner "was going to jail" and that she "was going to break [his] mother."  *Id.* at 203. Similarly, petitioner's mother averred that the aunt told her over the phone that petitioner "was going to jail and that she was going to break" her.  *Id.* at 204.  Petitioner's sister averred that, sometime in 2004, D.B.'s aunt told her, "if your brother [i.e., petitioner] isn't going to be with me then nobody isn't [*sic*] gunna be with him."  *Id.* at SR 206.

The Court concludes that these affidavits–which concern matters that the affiants

---

[10]  As discussed above, precedent in this Circuit, as well as others, support the proposition that findings of fact made by the state courts are presumptively correct under 28 U.S.C. § 2254(e)(1) in the context of a gateway actual innocence claim.  Petitioner has presented no evidence–much less clear and convincing evidence–to rebut that presumption with respect to the state court's credibility findings concerning the purported newly discovered evidence.  In any event, even if the presumption set forth in 28 U.S.C. § 2254(e)(1) did not apply to determinations of gateway actual innocence claims, the Court would reach the same result based upon its own review of the state court record.

[11]  The Court notes that,  in response to a subpoena duces tecum, the Albany Police Department disclosed certain documents concerning the aunt to the CPL § 440.10 court, but asserted that it had "no record of [her] being an informant for the police department."  Dkt. No. 18 at HT 3-4.

discussed with petitioner prior to trial–do not constitute the sort of "new reliable evidence" required by *Schlup*. 513 U.S. at 324. The affidavits do not suggest that the affiants have any personal knowledge of whether petitioner committed the crimes charged or were present at the times at issue, but rather related to two purportedly threatening statements made by D.B.'s aunt to petitioner's sister and mother, months before the first disclosures of petitioner's abuse. While the affidavits from petitioner's close family members plainly portray the aunt as antagonistic, they are of little probity with respect to petitioner's factual innocence of the children's allegations. *See, e.g., Colon v. Sheahan*, No. 1:13-CV-6744, 2016 WL 3919643, at *16-17 (S.D.N.Y. Jan. 13, 2016) (concluding that affidavits from "potential witnesses," including petitioner's parents and friends, were "not sufficient to shoulder the *Schlup* burden" because they included "no supporting proof, documentary or otherwise," were not from "disinterested" witnesses, and were insufficiently detailed and not probative of petitioner's whereabouts at the time of the crime), *adopted*, 2016 WL 3926443, at *7 (S.D.N.Y. July 14, 2016); *Read v. Thompson*, No. 7:13-CV-3661, 2016 WL 165715, at *10 (S.D.N.Y. Jan. 13, 2016); *Philbert v. Brown*, No. 1:11-CV-1805, 2012 WL 4849011, at *7 (E.D.N.Y. Oct. 11, 2012) (rejecting claim of actual innocence to overcome procedural default, where new evidence consisted of affidavits from petitioner's "girlfriend and his girlfriend's mother," and one such affidavit "state[d] only a belief, as opposed to actual knowledge," as to petitioner's whereabouts at the time of the crime); *Desrosiers v. Phillips*, No. 1:05-CV-2941, 2006 WL 2092481, at *8 (E.D.N.Y. July 27, 2006) ("Generally, . . . exculpatory affidavits [from friends] do not establish actual innocence, as they are not reliable.").

Finally, trial counsel's conclusory reference in legal correspondence to having "proof that the kids were told to lie by their mother" sheds no light on what that "proof" is, much less

that it is newly discovered, credible, and compelling evidence of petitioner's actual innocence.[12]  The Court cannot conclude that trial counsel's cryptic assertion, in a letter predating both petitioner's direct appeal and motion to vacate, entitles him to the equitable exception to the AEDPA limitations period.

For the foregoing reasons, the Court concludes that petitioner's habeas petition is untimely and therefore must be dismissed.

## IV.    CONCLUSION

**WHEREFORE**, it is hereby

**ORDERED** that the petition (Dkt. No. 1) is **DISMISSED AS UNTIMELY**; and it is further

**ORDERED** that no Certificate of Appealability ("COA") shall issue because petitioner failed to make a "substantial showing of the denial of a constitutional right" as 28 U.S.C. § 2253(c)(2) requires.[13]  Any further request for a COA must be addressed to the Court of Appeals (Fed. R. App. P. 22(b)); and it is further

**ORDERED** that the Clerk send petitioner copies of the unpublished decisions cited in this Decision and Order in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam); and it is further

**ORDERED** that the Clerk serve copies of this Decision and Order upon the parties in

---

[12]  At the hearing regarding his motion to vacate, while represented by different counsel, petitioner did not call any witnesses or proffer any other evidence related to trial counsel's letter.

[13]  *See Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (holding that "§ 2253 permits the issuance of a COA only where a petitioner has made a 'substantial showing of the denial of a constitutional right'"); *Richardson v. Greene*, 497 F.3d 212, 217 (2d Cir. 2007) (holding that, if the court denies a habeas petition on procedural grounds, "the certificate of appealability must show that jurists of reason would find debatable two issues: (1) that the district court was correct in its procedural ruling, *and* (2) that the applicant has established a valid constitutional violation" (citation omitted)).

accordance with the Local Rules.

**IT IS SO ORDERED**.

Dated: May 31, 2018
           Syracuse, NY

Brenda K. Sannes
U.S. District Judge